CONCEPCIÓN LOZADA OCASIO, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE CAGUAS, SECCIÓN I, LIC. LUIS MOJICA SANDOZ, recurrido.

*Número:* O-70-161        *Resuelto:* 7 de diciembre de 1970

436

*Gloria M. Mimoso Raspaldo,* abogada del recurrente; el Registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Los esposos Lozada-Rivera, a quienes llamaremos los Lozada, y los esposos Contreras-Lozada, a quienes llamaremos los Contreras, otorgaron una escritura pública en la cual hacen constar lo que sigue.

Los Lozada son dueños de un solar urbano de 209.60 metros cuadrados sito en Caguas, Puerto Rico, y de una casa terrera de concreto armado y bloques de hormigón

enclavada en dicho solar. Mediante mutuo acuerdo y previo el pago de $500.00 los Lozada pactaron y consintieron en que los Contreras edificasen sobre la mencionada residencia una casa, que en efecto es una segunda planta, y la cual se describe detalladamente en la escritura. Por los términos de dicha descripción entendemos que se trata de una casa construida para fines de vivienda. Expresan los Contreras que el valor de la segunda planta que construyeron es de $10,000.00. Los Lozada expresamente consienten en que dicha segunda planta sea inscrita en el Registro de la Propiedad a nombre de sus dueños los Contreras.

También expresan los Lozada que en consideración al pago adicional de $200.00 que recibieron de los Contreras, conceden a éstos el derecho de tener acceso hasta la escalera que conduce a la planta alta por la marquesina de su casa, o sea, por la marquesina de la primera planta. También concedieron autorización a los Contreras a guardar su automóvil en dicha marquesina.

El Registrador de la Propiedad de la Sección Primera de Caguas, Puerto Rico, Don Luis Mojica Sandoz, denegó la inscripción del documento con una Nota Denegatoria que copiada *verbatim* dice como sigue:

"Se deniega la inscripción del presente documento por entender que se trata aquí del establecimiento de una propiedad por pisos, es decir, propiedad horizontal, y que por lo tanto es imperativo el sometimiento del edificio al régimen establecido por la Ley de la Propiedad Horizontal aprobada el 25 de junio de 1958, ya que según el Artículo 47 de ésta, las únicas disposiciones que rigen la materia son las contenidas en dicha ley a partir de la fecha de su vigencia. No se ha cumplido con la citada ley especialmente en lo concerniente a la descripción de los elementos comunes generales del edificio, a la indicación del destino que se le dará a cada piso, y en lo relativo a la administración del inmueble (Art. 22). Tampoco se incluye un reglamento en la escritura de constitución (Arts. 36–37), ni los planos requeridos (Art. 24), tomándose en su lugar anotación preventiva por el término legal de 120 días a favor de los

esposos Ángel Manuel Contreras y Luz María Lozada Rivera, al folio 245 vuelto del tomo 215 de Caguas, finca número 6464, anotación "A"."

Por su parte los recurrentes sostienen que las disposiciones de la Ley de la Propiedad Horizontal son aplicables solamente a los edificios cuyos dueños declaran expresamente su voluntad de someterlos a ese régimen y que ellos no lo han hecho así, ni desean hacerlo.

Obsérvese, señalan los comparecientes, que en la escritura no se solicita que se inscriba el segundo piso como finca independiente sino que lo que se pide es que se inscriba como parte de la finca matriz. Por lo tanto, señalan, no es de aplicación el Art. 47 de la Ley de la Propiedad Horizontal pues no están solicitando la inscripción de la segunda planta bajo los términos del Art. 330 del Código Civil ni tampoco bajo los términos de la Ley de la Propiedad Horizontal.

Razona el Señor Registrador que no estando ya disponibles para los recurrentes las disposiciones del Art. 330 del Código Civil, 31 L.P.R.A. sec. 1275, por mandato expreso del Art. 47 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293k, y tratándose, en su opinión, de un caso de propiedad horizontal, la escritura no contiene los requisitos que debe incluir, los cuales él menciona en su Nota Denegatoria.

De tener razón el Señor Registrador los recurrentes estarían abocados a una de las siguientes tres posibles situaciones: (1) acogerse, juntamente con los dueños de la primera planta, al régimen de la propiedad horizontal, lo que podría resultarle oneroso a ambas partes debido al modesto valor del inmueble; (2) a convertirse en condueños proindiviso, en la proporción que su inversión lo justificase, de todo el inmueble, situación generalmente incómoda; y (3) a enfrentarse con el articulado del Código Civil que rige la accesión respecto de los bienes inmuebles, situación también harto indeseable. De un examen de la escritura surge con claridad meridiana que las partes no tuvieron la intención

de colocarse en ninguna de las tres situaciones antes mencionadas.

Luego de ponderar el problema a la luz de nuestro derecho civil y de las mejores corrientes contemporáneas de pensamiento sobre el mismo, creemos que hay una cuarta solución más justiciera. Constituye este caso uno de esos en que los tribunales tenemos que encarar uno de los muchos intricados problemas que plantea, en su riqueza inagotable, la difícil pero enaltecedora tarea de aplicar el Derecho a la vida real.

■ Por expresarlo así la ley, no hay duda de que someter un inmueble al régimen de la propiedad horizontal es un acto voluntario del dueño o dueños del mismo. Art. 2 de la Ley de la Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958; 31 L.P.R.A. sec. 1291. Tampoco hay duda de que si se desea hacerlo hay que cumplir con las formalidades que exige la misma. 31 L.P.R.A. sec. 1292 y ss.

Antes de que nuestro derecho positivo contase con la Ley de la Propiedad Horizontal la materia se regía por el Art. 330 del Código Civil, 31 L.P.R.A. sec. 1275, correspondiente al 396 del Código Civil español, el cual procedía, a su vez, del Art. 664 del Código Napoleón. Nuestro Art. 330, según enmendado, constituía en efecto una pequeña ley de propiedad horizontal. Habla de pisos de un edificio poseídos por distintos propietarios y de los elementos comunes del edificio "tales como el suelo, fundaciones, sótanos, muros, fosos, patios, pozos, escaleras, ascensores . . ." etc.; dispone sobre los gastos de conservación de los elementos comunes y sobre otros extremos característicos del régimen de la propiedad horizontal.

Cuando comenzó la labor de la codificación europea a fines del siglo 18 y a principios del 19, por no haber llegado la propiedad horizontal al auge que tiene en estos tiempos, la materia fue tratada en los Códigos en forma muy somera. El Código Civil español, aunque se aprobó mucho más tarde, en el 1889, siguió esa tendencia. Prueba de ello son los textos originales de los Arts. 396 español y 330 puertorriqueño,

los cuales son iguales y constan de cuatro breves párrafos. Andando el tiempo tan parca reglamentación resultó insuficiente y fue necesario ampliar dichos artículos. La reforma del Art. 396 español se produjo por la Ley de 26 de octubre de 1939 y la del 330 puertorriqueño mediante la Ley Núm. 421 de 13 de mayo de 1951, la cual otra vez siguió de cerca el nuevo texto español.

Si bien la reforma, del 1939 en España y del 1951 en Puerto Rico, de dichos artículos del Código Civil introdujo cambios deseables, no recogió adecuadamente los principios caracterizadores de la institución de la propiedad horizontal ni la hizo objeto de una reglamentación especial y detallada como ya había ocurrido en otros países, tales como Bélgica, Francia, Italia,. Brazil, Bulgaria y Chile. Los problemas que en torno a la imperfecta regulación de esta materia existían, aunque paliados de momento con la reforma mencionada, continuaron agravándose. El desarrollo urbano en todas partes clamaba por atención al problema. (¹)

Atendiendo a esa necesidad nuestra Asamblea Legislativa consideró y aprobó la que se convirtió en nuestra vigente Ley de la Propiedad Horizontal, la cual tomó de modelo a la Ley cubana Núm. 407 de 18 de septiembre de 1952. Dicha ley cubana de 1952 ya estaba reconocida como una excelente pieza de legislación. Además, su adopción en Puerto Rico era propicia pues el Código Civil y la Ley Hipotecaria de Cuba eran prácticamente iguales a las de Puerto Rico, y como se sabe, tienen un origen común. (²) En España tam-

---

(¹) *Castle Enterprises* v. *Registrador*, 87 D.P.R. 775 (1963); Fernández Martín-Granizo, *La Ley de la Propiedad Horizontal en el Derecho Español*, Madrid (1962), págs. 92–93; Batlle-Vázquez, *La Propiedad de Casas por Pisos*, 6ta. ed. rev. (1970), págs. 37–41; Ferrer y Stecher, *Law of Condominium* (1967), Vol. 1, sec. 43.

(²) *Diario de Sesiones de la Asamblea Legislativa de Puerto Rico*, Vol. 10, Tomo 3, págs. 1574 y 1649 y Vol. 10, Tomo 4, pág. 2004, ambos del año 1958; Aguirre, Agustín, *Tres Conferencias Sobre Propiedad Hori-*

bién resultaba ya insuficiente el Art. 396 según reformado en el año 1939 y allá se aprobó la Ley de Propiedad Horizontal de 21 de julio de 1960. También se hicieron en aquel país las correspondientes modificaciones a la Ley Hipotecaria.

Siendo, pues, la Ley de la Propiedad Horizontal una legislación más completa y superior a la reglamentación contenida en el Art. 330 del Código Civil, el legislador dispuso en el Art. 47 de la nueva ley que las disposiciones del Art. 330 del Código y de la Ley Núm. 422 de 13 de mayo de 1951, enmendatoria del Art. 8 de la Ley Hipotecaria, serían aplicables únicamente a aquellos edificios cuyos pisos ya estaban constituidos en virtud de esos preceptos legales a la fecha en que comenzó a regir la Ley de la Propiedad Horizontal. 31 L.P.R.A. sec. 1293k. En otras palabras, el legislador dispuso que en la actualidad quien desee someter un edificio al régimen de la propiedad horizontal tiene que hacerlo vía la Ley Núm. 104 de 25 de junio de 1958; 31 L.P.R.A. sec. 1291 y ss.

Pero lo anterior no puede esgrimirse como argumento contra los recurrentes pues ellos, y los otros comparecientes en la antes referida escritura, no intentan inscribir un derecho real bajo el Art. 330 del Código ni bajo la Ley de la Propiedad Horizontal. Los Lozada ciertamente no han pactado que desean someter su propiedad al régimen de la propiedad horizontal, ni que desean que el solar en que se asienta la casa, sus cimientos, paredes maestras, patio y jardín se conviertan en elementos comunes del inmueble. Ellos sólo han consentido a que sobre su casa los Contreras edifiquen una segunda planta y a darle acceso a dicha segunda planta pasando por la marquesina de su casa. También han consentido a que los Contreras guarden su automóvil en dicha marquesina.

zontal en Torno a la Ley de Puerto Rico, Madrid (1963), pág. 19. Estas conferencias también fueron publicadas en 36 Revista Crítica de Derecho Inmobiliario (1963), págs. 305-344 y 504-533.

442

Como nuestro ordenamiento jurídico sigue la doctrina del *numerus apertus*, debe ser claro que el Art. 47 de la Ley Núm. 104 antes citada no le impide a los recurrentes inscribir su indudable derecho real. Lo que le impide es, como ya dijimos, recurrir a las disposiciones del Art. 330 del Código Civil. Pero, como ya también señalamos, ellos no interesan hacer eso.

■ La situación es la siguiente. Los Lozada, dueños del solar y de la primera planta, han cedido y los Contreras han adquirido un derecho de superficie (sobre la casa de los Lozada) y al edificar allí han adquirido un derecho de propiedad sobre la casa que allí construyeron. Veamos esta situación jurídica un poco más de cerca.

Nada más apropiado para servir de introducción al estudio que sigue que los siguientes párrafos tomados del preámbulo que para su libro escribió Ventura-Traveset [3] y otro tomado de Castán. Las referidas palabras de Ventura-Traveset son las siguientes:

"Entre los múltiples aspectos que plantea el problema de la vivienda, uno de los que ocupan la atención de los juristas es la regulación de las relaciones jurídicas que se establecen entre las diferentes personas que aportan cada una uno de los elementos que precisan para la edificación o construcción de viviendas o locales. . . .

[L]a necesidad de aumentar las soluciones al magno problema de la vivienda, hace necesario lo que podría llamarse el aprovechamiento de los espacios vacíos existentes en el vuelo de edificios ya construídos, y cuya parcelación cúbica, ha de dar origen a nuevos pisos o locales.

Todo ello motiva que surjan en la esfera jurídica, con una frecuencia que hace poco tiempo no se daba, una gama de contratos que se otorgan por el que es propietario de un solar y carece de los medios económicos para edificar o no quiere convertirse en constructor y aquella otra persona que tiene estos últimos o es técnico en la edificación, y en cambio, carece del

---

[3] *Derecho de Edificación Sobre Finca Ajena y la Propiedad Horizontal*, Bosch, Barcelona (1963), pág. 7.

capital para adquirir un solar, que en la actualidad alcanza un precio bastante importante.

Otras veces es el propietario de un edificio más o menos antiguo, pero cuyos muros ofrecen la resistencia suficiente para poder sufrir una elevación en varias plantas, con la práctica utilización de un espacio aéreo que antes estaba perdido, y que lo aporta para que sobre él y por quien tiene el capital y la capacidad técnica precisa, puedan edificarse nuevos pisos o locales."

El párrafo tomado de Castán, *Derecho Civil Español, Común y Foral*, Tomo II, Vol. II, 10ma. ed. (1965), pág. 320, es el siguiente:

"Como dice muy bien Roca Sastre, 'el crecimiento constante de la población en muchas ciudades importantes impone actualmente la necesidad de aprovechar hasta el grado máximo conveniente el área superior e inferior de los edificios ya existentes mediante aumentar el número de plantas, sea a base de elevarlos a mayor altura, sea a base de edificar en su subsuelo, en la medida en que lo permitan las ordenanzas municipales'. Pues bien, esta necesidad ha impuesto la utilización de pactos con trascendencia real, a través de los cuales se ceda *a persona distinta del dueño del edificio el derecho de elevarlo o profundizarlo,* haciendo encima o debajo nuevas plantas o construcciones." (Énfasis nuestro.)

Puig Peña nos dá una definición tradicional del derecho de superficie. En su *Tratado de Derecho Civil Español,* Tomo III, Vol. I (sin fecha), pág. 475, expresa que puede entenderse por derecho de superficie "aquel de naturaleza real por cuya virtud una persona (concedente) otorga a otra (superficiario) el derecho a levantar en el suelo de su propiedad edificios o plantaciones de las que deviene titular el que las hace bajo ciertas y determinadas condiciones."

■ Escribiendo más recientemente Roca-Sastre se ha expresado como sigue: "Según el concepto moderno, el derecho de superficie es el derecho real de tener o mantener, temporal o indefinidamente, en terreno *o inmueble* ajeno, una edificación o plantación en *propiedad separada,* obtenida mediante

el ejercicio del derecho anejo de edificar o plantar o por medio de un acto adquisitivo de la edificación o plantación preexistente." (Subrayado nuestro.) "Ensayo Sobre el Derecho de Superficie", publicado en la *Revista Crítica de Derecho Inmobiliario*, número extraordinario, Conmemorativo del Primer Centenario de la Ley Hipotecaria Española de 1861, Núms. 392–393 (enero–febrero 1961) pág. 7.

El derecho de superficie data de tiempos remotos. No es necesario que relatemos aquí su historia pues el interesado puede hallarla en las fuentes que mencionaremos a continuación. Para un enfoque histórico véase González Martínez, *Estudios de Derecho Hipotecario y Civil*, Tomo II (1948), pág. 221 y ss. Para un tratamiento moderno véase Roca Sastre, "Ensayo Sobre el Derecho de Superficie", en la *Revista Crítica de Derecho Inmobiliario*, tomo antes citado. En el mismo sentido véase Puig Brutau, *Fundamentos de Derecho Civil* (1953), Tomo III, págs. 503–513. Para una excelente síntesis véase Castán, *Derecho Civil Español, Común y Foral*, Tomo II, Vol. II, 10ma. ed. rev. (1965), págs. 302–321. Castán con su acostumbrada erudición cita una veintena de otros trabajos. Puede verse también Puig Peña, *Tratado de Derecho Civil Español*, Tomo III, Vol. I (no tiene fecha), págs. 475–484.

En vista de lo anterior nos limitaremos a citar algunos pasajes que consideramos pertinentes.

La evolución del derecho de superficie fue fatigosa debido a la rigidez de la antigua regla romana *superficies solo cedit*. Explica Roca Sastre que primeramente el derecho de superficie tuvo carácter de derecho personal u obligacional. Después se protegió con interdictos, hasta que en el Derecho romano post-clásico fue considerado como un derecho real y transmisible. Pero el derecho de superficie no pasó de ser en el Derecho romano un *ius in re aliena* sobre la edificación construida por el superficiario, ya que sólo lo conoció como un derecho de construcción y de goce de lo construido.

En el *Corpus* el derecho de superficie solamente atribuye la facultad de aprovechar la edificación construida por el superficiario, pero sin llegar nunca a implicar la figura jurídica de propiedad separada, o sea, la propiedad superficiaria de la edificación—como modernamente se concibe el derecho de superficie.

Esto era así debido a que el Derecho romano no reconocía la figura de la propiedad de la edificación como propiedad separada de la del suelo, sencillamente porque siempre actuaba la accesión, principio éste que en materia de bienes muebles incorporados a fincas operaba siempre sin excepciones. Este concepto, manifestado en la regla clásica *superficies solo cedit* dificultaba reconocer al constructor en suelo ajeno la propiedad de lo construido. En la evolución y desarrollo que inevitablemente tuvo—y sigue teniendo—el derecho civil el derecho germánico aportó la idea inversa de dar mayor valor a la edificación que al suelo y se admitió la propiedad de la edificación o plantación separada del terreno.

Y así, como señala Roca Sastre, "En la segunda mitad de la época del *ius commune* la rigidez de la regla clásica romana *superficies solo cedit* se va debilitando y el derecho de superficie va asimismo desprendiéndose de la enfiteusis y evolucionando hacia la concepción moderna del derecho de superficie concebido como *propiedad separada*."—*Ensayo*, pág. 11.

Puig Brutau, obra y lugar citados, luego de trazar a grandes rasgos la evolución del derecho real que nos ocupa concluye lo siguiente:

"Es decir, modernamente se concibe el derecho de superficie como una efectiva derogación de la regla de que todo lo edificado cede como accesión o en beneficio del dueño del suelo (*superficies solo cedit*). Ahora se concibe posible que un sujeto de derecho tenga la propiedad del suelo y que otro distinto tenga la del edificio que en el mismo se levante."

En la época de la codificación los códigos civiles europeos admitieron, aunque tímidamente, el derecho de superficie. El nuevo Código Civil italiano (1942), reconociendo la realidad, ha incorporado a su texto una amplia regulación del derecho de superficie en sus artículos 952 al 956. Puede verse el texto de dicho Código en Messineo, *Derecho Civil y Comercial*, Buenos Aires (1954), Tomo I, pág. 133 y ss.

J. W. Jones señala que resulta sumamente interesante el caso de la *superficies* por el impulso que adquiere en el siglo XX, después de haber quedado arrinconada durante el siglo XIX, pero dicho autor reconoce que el derecho civil moderno se ha movido a revigorizar el derecho de la propiedad superficiaria respondiendo especialmente a las necesidades urbanas contemporáneas.—*Historical Introduction to the Theory of Law*, Oxford (1940), pág. 269. Hay una reimpresión de esta obra del año 1969. En esta nueva publicación la página antes indicada es la misma.

Escribe Puig Brutau, obra y lugar citados, "Hay que partir, pues de la realidad de ser el derecho real de superficie una figura jurídica admitida en nuestro Derecho."

Puig Peña, luego de discutir la evolución de este derecho y las diversas opiniones que sobre él se han vertido, se decide por la que le

"[P]arece la más correcta, que se va recibiendo con mayor aplauso y que en definitiva representa el término de la evolución doctrinal y legal experimentada por el fenómeno superficiario, mantiene un punto de vista integral en el sentido de entender que la superficie constituye un derecho real sobre el suelo y al mismo tiempo una propiedad superficiaria o separada. . . ." Y añade: "El dueño del suelo renuncia por esta concesión a la ley de la accesión y faculta al tercero (mediando o no la contraprestación de un canon) para construir cuando lo crea conveniente.

La relación entre el superficiario y la construcción levantada determina la propiedad superficiaria, pues a medida que se va construyendo en virtud de la concesión *ad aedificandum*, va

naciendo la propiedad separada a favor del superficiario."—Obra y tomo citado, pág. 477.

Castán, luego de reconocer que los códigos del siglo pasado (del cual el nuestro es uno) de tipo individualista, vieron con prevención la propiedad dividida y que apenas reglamentaron el derecho de superficie, explica que durante el siglo XX se ha iniciado una reacción legislativa y doctrinal en favor de este derecho, que se considera hoy excelente instrumento para atender algunas necesidades jurídicas que no pueden ser satisfechas con otros medios, y, sobre todo, para ayudar a resolver el problema de la vivienda, tan agudo en nuestros tiempos. ([4]) Añade dicho autor:

"En general, la doctrina moderna marca un positivo avance hacia la concepción del derecho de superficie como una forma de propiedad. Decaído el principio *superficies solo cedit*, que era tan fundamental para el Derecho romano, y reconocida por los escritores y las legislaciones modernas la admisibilidad de una propiedad dividida por planos horizontales, es lógica la posición adoptada por el Código italiano de 1942, en el cual . . . la superficie es una una propiedad como las demás."

En cuanto al derecho de superficie Roca Sastre explica que tiene las siguientes características fundamenles: (1) es un derecho real; (2) tiene por objeto tener o mantener en terreno o inmueble ajeno una edificación o plantación en propiedad separada; (3) hace posible la pro-

---

([4]) Escribiendo sobre la "tónica actual del derecho de propiedad" explica Castán que la orientación moderna de dicho derecho tiene como nota sobresaliente "la rectificación del sentido individualista que alcanzó el derecho de propiedad en la teoría tradicional, que, elaborada por los romanistas y por la llamada escuela del Derecho natural, pasó a los Códigos modernos." Añade: "Está hoy enteramente desacreditada la concepción individualista de la propiedad como un derecho ilimitado sobre la cosa. . . . El problema de la propiedad, como en general el de todo el Derecho, es un problema de límites. Todo estriba en determinar los temperamentos que hay que asignar al concepto de la propiedad para evitar que constituya ésta un entorpecimiento y una restricción odiosa de los derechos del consorcio civil."—Castán, obra citada, Tomo II, Vol. 1, 10ma. ed. rev. (1964), pág. 99 y ss.

piedad separada del edificio respecto del suelo donde radica; (4) puede ser de duración temporal o de duración indefinida; y (5) puede referirse a edificaciones sobre el suelo y a edificaciones debajo de él.—*Ensayo*, pág. 16 y ss.

Entrando en la teoría que explica la esencia del derecho de superficie y del derecho de propiedad superficiaria Roca Sastre escribe:

"Una cosa es el *derecho de superficie,* que es la expresión de aquella relación jurídica que permite al superficiario *tener* o *mantener* en terreno de otro la propiedad de la edificación, y otra es la *propiedad de esta edificación,* cuya existencia hace posible el derecho de superficie, y que, por esto, se denomina *propiedad superficiaria.* . . .

El *derecho de superficie* es el *soporte jurídico* de la *propiedad superficiaria* . . . ." (Bastardillas nuestras.)—*Ensayo*, pág. 19.

El mismo autor señala que "el derecho de superficie puede recaer sobre o bajo suelo ajeno, e incluso sobre *la edificación* ya construida, así como en rigor debajo de la edificación construida en el subsuelo."—*Ensayo*, pág. 41.

Los tratadistas—Roca Sastre, Castán, Puig Peña, etc.— discuten sistemáticamente los deberes y derechos del *dominus soli* (el concedente) y del superficiario.

Nuestro Código Civil menciona el derecho de superficie en su Art. 1503, 31 L.P.R.A. sec. 4178, como consecuencia de mencionarlo también su predecesor el Código Civil español de 1889. Pero, como señala Roca Sastre, con anterioridad al Código, la Ley Hipotecaria de 1861, con una visión más amplia que aquél, contempló la existencia del derecho de superficie como un derecho autónomo y desligado de la enfiteusis, y así dicha ley en su Art. 107(5) incluyó el derecho de superficie entre los bienes que pueden hipotecarse "siempre que quede a salvo el de los demás partícipes en la propiedad."— *Ensayo*, pág. 12.

Igualmente nuestra Ley Hipotecaria (1893) también en su Art. 107(5) dispone expresamente que podrá hipotecarse

el derecho de superficie. 30 L.P.R.A. sec. 203(5). Dada la clara naturaleza de derecho real de los derechos de superficie y de propiedad superficiaria, no hay duda de que son inscribibles en Puerto Rico, igual que en España. Nuestra citada Ley Hipotecaria en su Art. 2, al relacionar los derechos inscribibles, luego de mencionar los más conocidos añade "y otros cualesquiera reales." 30 L.P.R.A. sec. 2(2). V. también en el Reglamento Hipotecario sus Arts. 24 y 27. 30 L.P.R.A. secs. 854 y 857. Como hemos señalado antes, nuestro ordenamiento jurídico sigue la doctrina del *numerus apertus*. Igual doctrina sigue el proyecto de Código Hipotecario sometido por el Gobernador a la Asamblea Legislativa en su sesión ordinaria de 1967 (P. de la C. 782 de 9 de marzo de 1967). En su Art. 120 dicho proyecto dispone que se inscribirán los títulos contentivos de los actos y contratos traslativos, declarativos o extintivos del dominio de los inmuebles o de los derechos reales y cualesquiera otros que modifiquen algunas de las facultades del dominio sobre bienes inmuebles o las inherentes a dichos derechos reales, *aunque no tengan nombre propio.*

Reconociendo la parquedad con que el Código Civil español, y por ende el nuestro, menciona el derecho de superficie pero reconociéndole también su naturaleza de derecho real, Castán escribe:

"No está reglamentado específicamente en nuestro Código civil; pero nos da una base para atribuirle categoría de derecho real el número 5.° del artículo 107 de la ley Hipotecaria, al considerarlo hipotecable."—Obra citada, Tomo II, Vol. I, 10ma. ed. rev. (1964), pág. 44.

En el caso de autos los comparecientes en la escritura no han pactado, como antes señalamos, someter un inmueble al régimen de la propiedad horizontal. Tampoco se trata de un censo enfitéutico pues no se ha fijado en el contrato ninguna pensión anual. Dicha pensión anual es un elemento esencial para constituir censos enfitéuticos. Art.

1521 del Código Civil; 31 L.P.R.A. sec. 4212. En el caso que tenemos ante nuestra consideración los superficiarios adquirieron mediante el pago de una suma determinada de dinero un derecho de superficie sobre el inmueble de los concedentes y al edificar sobre dicha superficie han adquirido un derecho de propiedad sobre lo que allí construyeron. Como hemos visto, esos son derechos reales e inscribibles.

En vista de lo anterior *se revocará la nota recurrida del Señor Registrador y se le ordenará que inscriba el documento presentádole por los recurrentes.* ([5])

El Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Santana Becerra no intervinieron. El Juez Asociado Señor Pérez Pimentel concurre en el resultado.

---

([5]) En casos de edificios de varios pisos pertenecientes a distintas personas y cuyos edificios tengan elementos comunes tales como vestíbulo, pasillos, ascensores, sótanos, patios, incineradores, etc., el régimen de la propiedad horizontal es el indicado debido a los problemas de administración y de conservación que presentan.